409 A.2d 88

**Lonnie E. HENGST**

v.

**Linda M. HENGST, Appellant.**

Superior Court of Pennsylvania.

Argued March 12, 1979.

Filed Aug. 30, 1979.

Petition for Allowance of Appeal Granted Jan. 16, 1980.

Samuel K. Gates, York, for appellant.

Daniel R. Kehm, York, for appellee.

Before SPAETH, HESTER and MONTGOMERY, JJ.

HESTER, Judge:

Presently before the court is appellant-wife's appeal from the final order of the lower court dated March 3, 1978, wherein appellant-wife's exceptions to the Decree Nisi entered July 29, 1977, were dismissed and the Decree Nisi was adopted and entered as the final decree of the lower court.

■ In this equity action, appellant-wife claims that the assets of the Thrift Plan,[1] although titled in appellee-husband's name alone, are joint property or owned as tenants by the entireties and therefore subject to partition[2] at the rate of one-half to appellant-wife and one-half to appellee-husband.

The lower court disagreed with appellant and held that the assets of the Thrift Plan although treated during their marriage *by both parties* as either jointly owned or owned as tenants by the entireties was nevertheless not jointly owned nor owned by the parties as tenants by the entireties and therefore not subject to partition.

We agree with the lower court and therefore affirm.

1. The particular Thrift Plan in the instant case is a voluntary savings plan available to management employees of American Stores Company (American) of which appellee was an eligible participant. Commencing January 1, 1973, appellee authorized American to withhold a certain percentage of his wages (originally 5%, then up to 6%) with which American purchased United States savings bonds in the employee's individual name. In addition, as an integral part of the plan, American contributed from its own funds an amount equivalent to one-half of the sums deducted from the employee's wages and with these employer contributions, purchased American common stock in the employee's name.

Ordinarily, the government bonds and American stock were held by American until the participating management employee retired at which time the bonds and stock certificates were to be delivered to him. Prior to retirement, however, the employee could request delivery of the bonds and stock subject, however, to American's vesting schedule which imposed certain penalties involving the loss of a portion of the stock.

For example, it was stipulated by the parties that as of October 1, 1976, American was holding for appellee, 383 United States savings bonds, series E, valued at $9,111.90 and 194.77 shares of American stock valued at $31\frac{1}{8}$ per share, or $6,062.34 for a total of $15,174.33. It was further stipulated by the parties that if appellee were to withdraw all of his Thrift Plan assets, he would forfeit 72.356 American shares, valued at $2,252.08.

2. A conveyance to the marital unit, without more, vests title in both spouses as tenants by the entireties (*Brenner v. Sukenik*, 410 Pa. 324, 330, 189 A.2d 246, 249 (1963)). Under the Act of May 17, 1949 P.L. 1394, 68 P.S. § 501, after divorce, the former spouses become tenants in common of equal one-half shares of the property acquired after 1949 which was owned by them as tenants by the entireties.

■ The law of the Commonwealth is such that "we recognize that the findings of facts of the chancellor, who heard the testimony without a jury, approved by the court en banc, are entitled to the weight of a jury's verdict, that such findings are controlling and that the court's decree should not be reversed unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Lanning Will*, 414 Pa. 313, 316, 200 A.2d 392, 393 (1964); *Sterrett v. Sterrett*, 401 Pa. 583, 166 A.2d 1 (1960); *Brown v. Gresh*, 402 Pa. 35, 165 A.2d 629 (1960). However, where the conclusions reached by the chancellor, either of law or ultimate fact, are no more than the chancellor's reasoning from the underlying facts, such conclusions are reviewable. *Shapiro v. Shapiro*, 424 Pa. 120, 127, 221 A.2d 164, 168 (1966).

The salient facts may be briefly summarized as follows: The parties were divorced by decree dated October 6, 1976. Two children were born of the marriage. At the time of the lower court's adjudication, appellee had been an employee of American for 19 years and was presently a manager of one of its Acme Markets. Commencing in January of 1963, appellee had begun participating in America's Thrift Plan and had continued to participate through the time of the lower court hearing. At hearing, both parties testified that despite the facts that they did not have an agreement in writing, they both considered the Thrift Plan to be jointly owned property (R. 2, 3, 13, 17).

Notwithstanding the parties' testimony to the contrary, the Chancellor denied appellant's request for the division or partition of the assets of the Thrift Plan.

The lower court's conclusion appears to have been reached by the following steps:

1. During the marriage both parties treated the Thrift Plan as jointly owned property.

2. The Thrift Plan is in the nature of a chose in action.

3. Because the appellee-husband treated the Thrift Plan as jointly owned property *he thereby intended to*

*make a gift* of one-half of its value to appellant-wife. (Emphasis added)

4. " . . . That in order for a valid gift to occur, the allegations must disclose a donative intent, a delivery (actual or constructive), and an acceptance. However, when a gift of a chose in action is alleged, the required delivery is not accomplished unless there is an actual or constructive delivery of a writing, setting forth the nature of the subject matter of the gift." *Kreisl v. Kreisl*, 415 Pa. 424, 204 A.2d 40, 41 (1964); *Russell Estate*, 385 Pa. 557, 123 A.2d 708, 63 A.L.R.2d 251 (1956), and cases cited therein.

5. Since in the instant case it is undisputed that the appellee-husband never indicated or evidenced appellant-wife's joint ownership in the Thrift Plan *by a writing*, the proposed gift of one-half of said Thrift Plan was never completed. (Emphasis added).

6. Since there was never a completed gift, it follows that the Thrift Plan was not owned by the parties as tenants by the entireties or as joint tenants and therefore appellant-wife is not entitled to a partition thereof.

The Chancellor has classified the specified Thrift Plan in question as a "chose in action" [3] notwithstanding the fact that the plan with limitations had already vested in the appellee (see footnote 1).

Thus, the Chancellor applied the law of the Commonwealth as same applied to an inter vivos gift of a chose in

**3.** Black's Law Dictionary, Fourth Edition, page 305, defines "chose in action" as: A personal right not reduced into possession, but recoverable by a suit at law. A right to personal things of which the owner has not the possession, but merely a right of action for their possession. The phrase includes all personal chattels which are not in possession; and all property in action which depends entirely on contracts express or implied. A right to receive or recover a debt, demand, or damages on a cause of action *ex contractu* or for a tort or omission of a duty. A right to recover by suit a personal chattel. Assignable rights of action *ex contractu* and perhaps ex delicto. Personalty to which the owner has a right of possession in future, or a right of immediate possession, wrongfully withheld. (citations omitted).

action and concluded that the contemplated gift was never completed because same was never evidenced by a writing.

Appellant erroneously relies on *Di Florido v. Di Florido*, 459 Pa. 641, 331 A.2d 174 (1975) to support her contention that the Thrift Plan is subject to partition at the rate of one-half to Appellant and one-half to Appellee.

The Pennsylvania Supreme Court in *Di Florido*, discarded the presumption that, as between spouses, the purchaser of household items is the owner of same and, therefore, the non-purchasing spouse has the burden to show that a gift of said household items to the marital unit had not been made. In *Di Florido*, our Supreme Court specifically concluded that "we can not accept an approach that would base ownership of household items on proof of funding alone", . . . and "we will not burden either party with proving that such household items were donated to the marital unit". *Di Florido,* supra, 459 Pa. 651, 331 A.2d 179.

The *Di Florido* court therefore resolved:

"We conclude, therefore, that for the purpose of determining *title of household goods and furnishings* between husband and wife, the property that has been acquired in anticipation of or during marriage, and which has been possessed and used by both spouses, will, in the absence of evidence showing otherwise, be presumed to be held jointly by the entireties. Since in this case, *there was no proof of title to overcome such presumption,* and since, in any event, the only evidence adduced at trial comported with a finding of joint ownership, we will not disturb the lower court's findings." (Emphasis added). *Di Florido,* supra, p. 180.

We find that *Di Florido* is non-dispositive of the instant controversy. Here, at issue, are not household goods and furnishings but, rather, title to, or ownership of, a Thrift Plan, which was properly categorized by the lower court as a chose in action. Moreover, and more importantly, *Di Florido* is inapposite for the reason that while in *Di Florido* there was no proof of title to said household goods and furnishings, in the instant case it is uncontested that

title in and to said Thrift Plan vested in appellee's name alone.

Since we agree with the conclusion reached by the lower court, we will not disturb its findings.

Judgment affirmed.

SPAETH, J., files a dissenting opinion.

SPAETH, Judge, dissenting:

"[A]nytime either a husband or wife contributes towards the purchase of entireties property their contribution is presumed to be a gift to the other." *Butler v. Butler*, 464 Pa. 522, 528, 347 A.2d 477, 480 (1975). Here, throughout their marriage the parties treated the husband's pension plan as entireties property, and the wife by obtaining employment outside the home enabled the husband to increase his participation in the plan. The majority acknowledges these facts, and yet nevertheless holds that the husband made no gift of the plan to the entireties. In my opinion the law does not require so manifestly unfair a result.

I agree with the majority, and in any event it is established, that in order for there to be a valid gift there must be a donative intent and a delivery. *See Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637 (1978); *In re Estate of Young*, 480 Pa. 580, 391 A.2d 1037 (1978); *Wagner v. Wagner*, 466 Pa. 532, 353 A.2d 819 (1976). Here the question is not one of intent, for the husband admitted in open court under oath that he intended a gift. The question is only whether there was a delivery. I further agree with the majority that the pension plan may be described as a chose in action, and that as a general proposition of law, it may be said that in order for there to be a valid gift of a chose in action there must be actual or constructive delivery of a writing setting forth the nature and subject matter of the gift. *Kreisl v. Kreisl*, 415 Pa. 424, 204 A.2d 40 (1964); *Russell Estate*, 385 Pa. 557, 123 A.2d 708 (1956). Here it is undisputed that there was no delivery of such a writing. My difference with the majority is in concluding that on the facts here, that failure of

delivery does not mean that there was no gift. General propositions solve most cases, but not every case. One must always ask whether, even though a general proposition has not been satisfied, the considerations that it is intended to serve have been satisfied.

The requirement that a gift be delivered is not based upon the medieval concept of seisin so much as upon considerations of psychology and evidence. This may be seen by hypothesizing a gift in which there has been no delivery. One commentator, Professor Mechem, has described the situation that would result:

> If A has in his possession a chattel which is susceptible of ready manual tradition, and he desires to make an unconditional gift of that chattel to B, who is present and willing to accept it, A will normally express his donative intent in some form or other, and hand over the chattel. Conceivably, even, he may hand it to B without any other expression of donative intent. The need of such an act, i. e., the tradition, is instinctively felt by both parties. A pulls his watch from his pocket, says to B: "I hereby give you this watch" . . . and then returns the watch to his pocket. Is *that* transaction normal? The instincts of both parties will lead to a feeling that the transaction is not quite normal, not quite what it seems to be. Neither party, we will assume, has any idea of the legal principles involved, but neither's sense of incompleteness is any the less for that. A may say to himself: "If I gave it to him, why did I put it back in my pocket?" B may say to himself: "I guess he was joking, since he didn't in fact *give* it to me." The point appears to be that the feeling that there has been no gift is not necessarily to be attributed to insophistication, or to mediaeval-mindedness. Any idea of a gift under normal circumstances (and we are assuming the circumstances to be such) does include the idea of transfer of possession. If the title has passed to B, the right to possession automatically and simultaneously passes with it. A in retaining the watch is committing an unexplained breach of B's right to immedi-

ate and complete possession. Neither the law nor common sense readily places on events an interpretation necessarily involving an unlawful act on the part of one of the parties. B's inference that title did not pass, that there was some mistake or some condition, is reasonable and proper.

Mechem, *The Requirement of Delivery in Gifts of Chattels and of Choses in Action Evidenced by Commercial Instruments*, 21 Ill.L.Rev. 341, 346–47 (1926) (footnotes omitted).

Professor Mechem identifies the considerations of psychology and evidence that are served by requiring the delivery of a gift, as follows:

In the first place, the delivery makes vivid and concrete to the donor the significance of the act he is doing. Any one can realize the psychological difference between a man's saying he gives something, yet retaining it, and saying he gives it and seeing it pass irrevocably out of his control. The *wrench* of delivery, if the expression be understood and permissible, the little mental twinge at seeing his property pass from his hands into those of another, is an important element to the protection of the donor. If he is uncertain, if he hardly understands himself just what he means or (which is perhaps even more important) what he is understood to mean, he cannot fail to understand (and be understood) when he hands over the property. It gives him a locus penitentiae. It forces upon the most thoughtless and hasty at least a moment's acute consideration of the effects of what he is proposing to do. Where valuable property is being passed without consideration, perhaps in the agony of a dying moment, it does not seem unwise to insist upon this simple and automatic safeguard.

Secondly, the act of manual tradition is as unequivocal to actual witnesses of the transaction as to the donor himself. Here normality is a big factor. What did the donor say? What did he mean? Perhaps he spoke under his breath, or was unable to speak clearly. Perhaps he hesitated and contradicted himself so that the outcome of

his thought was not readily to be ascertained by witnesses in the flurry of the moment. If he hands over the property, he has done an act that will settle many doubts, an act perhaps capable of more than one interpretation, yet readily and naturally susceptible of but one.

Thirdly, and lastly, the fact of delivery gives the donee, subsequently to the act, at least prima facie evidence in favor of the alleged gift. The law does not presume unlawful acts. Possession is ordinarily rightful. The evidence is of course at best presumptive, yet better than none. If the donee comes out of the sick room and says the bonds have been given to him he will be more credited, and more reasonably, if he has them in his possession. It is easier to fabricate a story than to abstract the property. *Id.* at 348–49 (footnote omitted).

The importance of the delivery requirement thus is not the actual act of transfer itself but the effect the act of transfer has upon the donor, the donee, and third parties. Accordingly, if some act of the donor would have the same effects, and would thereby serve the same functions, as would an actual delivery of possession of the res, then it should be held that a valid gift has been made despite the fact that the res was not delivered. Thus the delivery of a sealed instrument to represent the res, or of a key to obtain a res locked in a trunk, has been held sufficient to effect a gift of the res, for the delivery of the key or instrument served the same functions as would have been served by an actual delivery of the res. *See* Mechem, *supra* (discussing symbolic delivery).

The first effect of delivery, as described by Professor Mechem, is the psychological impact of the act of delivery upon the donor. The act of transferring possession of the property signals to the donor that the time for joking is over and that the decision to make a gift entails the serious consequence of the loss of possession and control of the res. It is like the act of placing one's seal upon a contract—a solemn act impressing upon the donor the importance of the transaction. In this case I should find that this psychologi-

cal consideration of the delivery requirement was fully satisfied by the husband's act of testifying in court and under oath that he intended to make, and thought he had made, a gift of the pension plan to the entireties.

The second and third effects of delivery, as described by Professor Mechem, involve evidentiary considerations. They are directed to the problem of proving that a gift occurred and to the prevention of fraud against the alleged donor or third parties.

Evidence of delivery represents proof, frequently convincing, of the donor's donative intent. Conversely, a failure to make delivery contradicts an intent to make a gift. Evidence of delivery also tends to prevent fraud against a third party who adopts a relationship to the res in accordance with the possession of the res. To consider Professor Mechem's hypothetical donee of the undelivered watch: A pawnbroker will not allow the donee to pledge a watch he does not possess; but if the pawnbroker sees the donor give the watch to the donee and hears the donor say it is a gift, he may very likely rely on the donee's pledge of the watch. Moreover, where the watch is undelivered a later purchaser from the donor may defend himself against the hypothetical donee's claim of an earlier gift by arguing that there could have been no gift because the donor retained possession and he relied on that possession in making his purchase.

In this case none of the problems contemplated by these considerations of evidence is presented. The evidence of the husband's retention of the pension plan in his name and of his failure to deliver a writing to the wife in no way contradicted, but rather was consistent with, the evidence of his repeated declarations that the property was that of the marriage—of the entireties. As the husband testified, he did not intend a complete transfer to the wife, in which case the retention of any interest by the husband would have been inconsistent with an intent to make a gift. In the case of a gift to the entireties estate—to the marriage—evidence of possession or custody by either the husband or by the wife or both is consistent with evidence of intent to make a gift. *See Collins v. McCandless,* 179 Tenn. 656, 169 S.W.2d 850

(1943) (valid gift of half interest in bonds from husband to wife although no actual delivery of bonds; retention in husband's safe deposit box consistent with gift of half interest to wife). *See also In re Estate of Young, supra,* (delivery in joint tenancy must only "invest in the donee so much dominion and control . . . as is consonant with" joint ownership). Nor does this case involve the relationship of any third party to the res, and no third party will be adversely affected by a decision that the pension plan was entireties property. Accordingly, the consideration that there should be proof of delivery in order to prevent fraud is not pertinent to a decision that here there was a gift of the plan to the entireties.

The delivery requirement also protects the donor from fraud. In this aspect it resembles the Statute of Frauds. Absent a writing representing an alleged contract within the Statute of Frauds, the contract will not be enforced, for enforcement might impose a fraud upon the party against whom the contract has been pleaded. *See Simplex Precast Indus., Inc. v. Biehl,* 395 Pa. 105, 149 A.2d 121 (1959); *Gerlock v. Gabel,* 380 Pa. 471, 112 A.2d 78 (1955). Where, however, the party admits to the contract or somehow waives the claim of the Statute of Frauds, the contract will be enforced. Indeed, to deny enforcement in such a case might impose a fraud upon the pleader of the contract and would be inconsistent with the purpose of the Statute of Frauds, which is to prevent fraud. *See Simplex Precast Indus., Inc. v. Biehl, supra; Duffee v. Judson,* 251 Pa.Super. 406, 380 A.2d 843 (1977). So too in a case where the alleged donor denies that any gift was intended, or is unavailable and so cannot defend himself against a claim of a gift. However, where, as here, the donor, in open court and under oath, admits that he intended to make a gift, there is no reason not to enforce the gift in accordance with his intent, for there can be no fraud against him, and, as discussed, no third party is involved.

I should therefore hold that on the facts of this case a valid gift was made, and should reverse the order of the lower court.